**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Timothy Ghattas, MD,

Plaintiff,

v. Case No. 1:25-cv-388-MLB

OrthoAtlanta, LLC,

Defendant.

______________________________/

**OPINION & ORDER**

Plaintiff Dr. Timothy Ghattas sues his former employer, Defendant OrthoAtlanta, LLC for retaliation under the False Claims Act ("FCA") and breach of contract under Georgia law. (Dkt. 20.) Defendant moves to dismiss Plaintiff's claims. (Dkt. 21.) The Court grants Defendant's motion.

## I. Background

Defendant owns and operates a medical practice that specializes in orthopedic surgery and related medical services. (Dkt. 20 ¶ 8.) Defendant bills Medicare by submitting claims that include CPT codes to identify the medical services for which it seeks reimbursement. (*Id.*

¶¶ 4–5, 9.) As part of this, Defendant sometimes includes what the parties describe as "Modifier 25," a code to indicate it provided "a separate, significant, and identifiable evaluation-and-management service." (*Id.* ¶ 4.) A provider gets paid more if it includes Modifier 25 on its claim. (*Id.* ¶ 5.)

Plaintiff was one of Defendant's physicians, an owner (for a time), and a member of the Executive Committee. (*Id.* ¶¶ 7, 10–13.) Over time, he became critical of the frequency with which Defendant included Modifier 25 in its reimbursement requests. Plaintiff alleges that, in late 2022 or early 2023, he attended a meeting at which Dr. Orcutt (the President and Chairman of Defendant's Executive Committee) announced he used Modifier 25 "automatically" or "every time" he gave a steroid injection. (*Id.* ¶ 14.) Defendant's other physicians began using Modifier 25 "frequently and routinely" after that. (*Id.* ¶ 14.) One of Defendant's billing coders told Plaintiff "it was improper to use Modifier 25 without satisfying certain specific criteria." (*Id.* ¶ 16.) And, after research, Plaintiff "learned Dr. Orcutt's practice of automatically including Modifier 25 for steroid injections resulted in . . . [Defendant's] submission of fraudulent claims to Medicare." (*Id.* ¶ 16.)

From March 2023 through June 2023, Defendant provided its physicians training on the proper use of Modifier 25. Its Director of Coding, for example, sent an email on March 10, 2023 that had three attachments with instructions on the proper use of Modifier 25. (*Id.* ¶ 17.) On April 26, 2023, Piedmont Hospital's coding education supervisor sent emails with links to webinars on Modifier 25. (*Id.*) In May 2023, that coding supervisor sent another email with instructions about the proper use of the modifier. (*Id.*) Then on June 13, 2023, Defendant's Chief Medical Officer sent an email telling all Defendant's physicians "that it was mandatory that they watch the Modifier training webinar and that it [was] the physician's responsibility to make his/her PA's/NP's watch the webinar as well." (*Id.*) He also said "it was extremely important everyone be well informed on the proper use of Modifier 25 because the government had escalated oversite and punishment for incorrect application of Modifier 25." (*Id.*)

Plaintiff believed those instructions were "ambiguous and wholly inadequate" and "did not reduce [Defendant's] submission of false Modifier 25 claims to Medicare." (*Id.* ¶¶ 21–22.) So in the months that followed, Plaintiff told colleagues and members of the Executive

Committee that he believed Defendant was not doing enough to stop that conduct. He told Executive Committee members that (1) "additional or improved Modifier 25 training was needed to stop Ortho's unlawful practice of submitting false claims to Medicare"; (2) "a billing coder [should] accompany a physician in clinic to provide real time guidance and education on coding and use of Modifier 25 to reduce coding that defrauded the government;" and (3) "a tip sheet on Modifier 25 was needed to reduce improper use of Modifier 25." (*Id.* ¶¶ 24–26.) The Executive Committee rejected these suggestions. (*Id.* ¶ 27.)

Defendant terminated Plaintiff's employment about thirteen months later, claiming he had harassed other employees. (*Id.* ¶¶ 29, 40, 56.) Plaintiff claims Defendant actually fired him in retaliation for his Modifier 25 suggestions in violation of the FCA and both his employment contract and Defendant's operating agreement. (*Id.* ¶¶ 34, 36, 72.)

## II. Standard of Review

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must "accept all well-pleaded facts as true and construe them in the light most favorable to the plaintiff." *Womack v. Carroll Cnty., Georgia*, 840 F. App'x 404, 405 (11th Cir. 2020).[1] A complaint offering mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" is insufficient to state a claim and should be dismissed. *Iqbal*, 556 U.S. at 678.

## III. Discussion

Plaintiff claims Defendant violated the FCA by firing him in retaliation for the things he said to the Executive Committee in the Summer of 2023. To plead an FCA retaliation claim, he must plausibly allege he engaged in statutorily protected activity and, because of that, Defendant took an adverse employment action against him. *See Simon ex rel. Fla. Rehab. Assocs., PLLC v. Healthsouth of Sarasota Ltd. P'ship*, 2022 WL 3910607, at *5 (11th Cir. Aug. 31, 2022); *United States ex rel.*

---

[1] The Court recognizes *Womack* is unpublished and not binding. The Court cites it and other unpublished cases nevertheless as instructive. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

*Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018) ("[T]o sufficiently plead a § 3730(h) retaliation claim and thus survive a motion to dismiss, a plaintiff must allege facts sufficient to support a reasonable inference of three elements: (1) he engaged in protected activity; (2) his employer knew about the protected activity; and (3) his employer took adverse action against him as a result.").[2] Defendant does not deny it took an adverse action against Plaintiff when it fired him. But it argues Plaintiff has not sufficiently alleged he engaged in protected activity or that it fired Plaintiff because of that protected activity. The Court agrees.

### A. Protected Activity

Before 2009, the FCA protected employees from retaliation for having acted "in furtherance" of an FCA action, including initiating an action, participating in the investigation, and providing testimony or other assistance during an investigation or claim. *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1288 (11th Cir. 2021). The Eleventh Circuit construed that language to protect an employee from retaliation

[2] Though the parties state the elements in slightly different ways (*Compare* Dkts. 21-1 at 5, *with* 22 at 5–6), both versions include a showing of a protected activity, an adverse action, and a causal relationship between the two.

only when an employee took some action in the face of a "distinct possibility" that either the employee or the government would file an FCA complaint. *Id.*; *see also United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303 (11th Cir. 2010) (holding that § 3730(h) protects "an employee from retaliation where there [is] at least 'a distinct possibility' of litigation under the False Claims Act at the time of the employee's actions").

In 2009, Congress expanded the statute to also protect employees who engage in "efforts to stop 1 or more [FCA] violations." *Hickman*, 985 F.3d at 1288 ("[T]he new language is broader than the old."); *see United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 97 (2d Cir. 2017) (recognizing the second prong "broaden[s] the universe of protected conduct under § 3730(h)"). The Eleventh Circuit has not interpreted the amended language precisely, but has applied the so-called "objectively reasonable belief" standard from other circuits—requiring a plaintiff to show that, at the time he or she engaged in protected activity to stop an FCA violation, the employee had a "reasonable belief" his or her employer violated the FCA. *Hickman*, 985 F.3d at 1288; *see, e.g.*, *Simon ex rel. Fla. Rehab. Assocs., PLLC*, 2022

WL 3910607, at *6 (applying the objectively reasonable belief standard "without deciding that this is the applicable standard").[3]

Plaintiff argues "the Court may evaluate the adequacy of the complaint in pleading protected activity under both the reasonable belief and distinct possibility standards." (Dkt. 22 at 7.) Under Plaintiff's theory, a court uses the "distinct possibility" standard to assess a retaliation claim under the first prong (conduct in furtherance of an action) and the "objectively reasonable belief" standard to assess a retaliation claim under the second prong (efforts to stop 1 or more violations). (*Id.* at 7.) Plaintiff also asserts his allegations satisfy both tests. (*Id.* at 8.) Defendant responds that "the objective reasonableness

[3] Plaintiff suggests the objectively reasonable belief standard may not apply at the motion to dismiss stage. (*See* Dkt. 22 at 8–10.) Nothing suggests that conclusion. The standard is a judicial interpretation of the statute, not something particular to summary judgment. The Eleventh Circuit and other circuits have applied it to motions to dismiss. *See, e.g.*, *Briggs v. QuantiTech Inc.*, 2022 WL 1308494, at *1, 3 (11th Cir. May 2, 2022) (affirming dismissal for plaintiff's failure to show that he had an objectively reasonably belief that his employer was violating the False Claims Act); *Lisenby v. Olympus Corp. of the Americas*, 185 F.4th 384, 388 (3d Cir. 2026) (same); *Singletary v. Howard Univ.*, 939 F.3d 287, 297 (D.C. Cir. 2019) (reversing dismissal because plaintiff plausibly alleged facts showing that she took lawful measures to stop what she reasonably believed would violate the False Claims Act).

requirement applies under either" prong, and Plaintiff "fails to plead facts that satisfy it." (Dkt. 23 at 3.) Regardless of which test the Court uses, Plaintiff's allegations fail.

**1. Objectively Reasonable Belief**

To establish protected activity under the objectively reasonable belief standard, Plaintiff must plausibly allege the warnings he gave the Executive Committee in Summer 2023 about the need for better guidance on the proper use of Modifier 25 were "motivated by an objectively reasonable belief that [Defendant was] violating, or soon [would] violate" the FCA. *Hickman*, 985 F.3d at 1288. Plaintiff argues the following allegations in his complaint establish his objectively reasonable belief: (1) Dr. Orcutt's statement that he used Modifier 25 every time he gave a steroid injection (Dkts. 20 ¶ 14; 22 at 11); (2) Plaintiff "independently researched . . . and learned Dr. Orcutt's practice . . . resulted in . . . [Defendant's] submission of fraudulent claims to Medicare" and "thus [Plaintiff] learned and observed that other [] physicians regularly coded with Modifier 25 to cause submission of false claims to Medicare" (Dkts. 20 ¶ 16; 22 at 11–12); (3) Plaintiff's knowledge of "continuing discussions among the Committee members, other Ortho physicians and coders

reflecting growing apprehension over the regular and improper use of Modifier 25 in billing exposing Ortho to compliance risks from the false claims" (Dkts. 20 ¶ 18; 22 at 12); (4) Plaintiff believed the "education offered by [Defendant] regarding Modifier 25 was inadequate, that physicians were confused about when and how to use Modifier 25, and that false claims continued to be submitted" (Dkts. 20 ¶ 31; 22 at 14); and (5) Defendant internally circulated training and instructions on the proper use of Modifier 25 (Dkts. 20 ¶¶ 17, 19; 22 at 13).

These allegations are not enough. Plaintiff fails to plead how Dr. Orcutt's statement that he always used Modifier 25 following a steroid injection gives rise to a reasonable belief Dr. Orcutt or Defendant submitted fraudulent bills. (Dkts. 20 ¶ 14; 22 at 11.) Plaintiff does not allege Modifier 25 cannot be used for steroid injections. He simply says it requires a doctor to provide a "separate, significant, and identifiable evaluation-and-management service." Perhaps Dr. Orcutt provided that each time he administered a steroid injection. Or perhaps he did not and included the CPT code anyway. Plaintiff does not allege either way, and the Court does not assume what Plaintiff does not plead. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) ("A court's review

on a motion to dismiss is limited to the four corners of the complaint."). Put simply, the allegation that someone billed Modifier 25 for every steroid injection does not reasonably infer that it was wrong to do so.

Perhaps sensing this shortcoming in his complaint, Plaintiff argues in his response brief that "[h]e pleaded that Dr. Orcutt advocated the use of Modifier 25 in all circumstances regardless of the presence or absence of the requisite criteria." (Dkt. 22 at 13.) But that is not correct. As Defendant points out, Plaintiff's amended complaint contains no allegation that Dr. Orcutt admitted using the CPT code whether or not he provided the necessary evaluation-and-management service. That Plaintiff seeks to expand his complaint to include this allegation confirms the inadequacy of his existing allegations, and Plaintiff "cannot amend [his] claim via new allegations in a response brief." *Franklin v. Cenlar FSB*, 2021 WL 7708405, at *4 (N.D. Ga. May 13, 2021); *see also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam) (holding a plaintiff "may not amend her complaint through argument in a brief").

Plaintiff's allegations also have a temporal problem. Plaintiff claims Dr. Orcutt made this statement in late 2022 or early 2023, that

Defendant (and Piedmont Hospital) began providing extensive training about the importance of proper Modifier 25 billing in March 2023, and that he began raising the issue in June 2023. (Dkt. 20 ¶¶ 14, 17, 24.) He does not allege Dr. Orcutt, having received training, continued using Modifier 25 every time he did a steroid injection (let alone that he did so improperly). Plaintiff's allegations about Dr. Orcutt's alleged statement offer no reasonable basis to believe Defendant was submitting false claims. Similarly, Plaintiff's claim that he "independently researched" and learned Dr. Orcutt submitted false claims is conclusory and insufficient to allege plausibly his knowledge of false claims.

Defendant says Plaintiff's allegation that he "learned and observed" that his colleagues "regularly coded with Modifier 25 to cause submissions of false claims to Medicare" fails to plead facts establishing anyone misused Modifier 25 "for non-qualifying patient encounters." So it says this allegation cannot add to any objectively reasonable belief

Defendant was violating the FCA.[4] (Dkts. 21-1 at 13–15; 23 at 8–9).[5] In response, Plaintiff recites his allegations in the amended complaint, restating how Plaintiff "independently researched proper Modifier 25 use," "learned Dr. Orcutt's *practice* of automatically including Modifier 25 for steroid injections resulted in . . . submission of fraudulent claims to Medicare," and "thus learned and observed that *other Ortho physicians* regularly coded with Modifier 25 to cause submissions of false claims to Medicare." (Dkts. 20 ¶ 16; 22 at 11–12) (emphasis added).

---

[4] Defendant also argues Plaintiff failed to plead whether he knew anything about Defendant's "claims submission process, rather than just the initial coding done by physicians," and thus the amended complaint "furnishes no facts to suggest any coding errors that any [] physicians might have made were not corrected at the time of actual claims submission." (Dkts. 21-1 at 15–17; 23 at 9.) By not responding to Defendant's counterargument, Plaintiff concedes its accuracy. *Off. of the Att'y Gen. v. Smartbiz Telecom LLC*, 688 F. Supp. 3d 1230, 1239 (S.D. Fla. 2023) ("A party's failure to meaningfully respond to the opposing party's responsive counterarguments constitutes a concession of the counterargument's persuasiveness."); *Weinstein v. City of N. Bay Vill.*, 977 F.Supp.2d 1271, 1286 (S.D. Fla. 2013) (same).

[5] The page numbers on Defendant's motion to dismiss and brief in support of the motion to dismiss (Dkts. 21-1; 23) do not match the page numbers applied by the CM/ECF system. The Court cites the CM/ECF stamped page numbers for these documents (Dkts. 21-1; 23).

The Court agrees with Defendant. These conclusory assertions do not plausibly allege other physicians used Modifier 25 for ineligible patient encounters. To plausibly allege that misuse, Plaintiff must allege some basis for knowing that fact, like some basis for knowing the service these doctors provided, specifically that it did not include the requisite evaluation-and-management service, and some basis for knowing how they billed Medicare. But he does not do that. He simply alleges, "I learned that they did it"; which is no more plausible than simply alleging "they did it." And that is not enough. *See Lane v. Guar. Bank*, 552 F. App'x 934, 935–36_(11th Cir. 2014) ("A complaint that merely sets forth…mere conclusory statements in support of a threadbare recital of the elements of a cause of action will not suffice."); *Maglana v. Celebrity Cruises Inc.*, 136 F.4th 1032, 1037 (11th Cir. 2025) ("[W]e need not credit mere conclusory statements or threadbare recitals of the elements of a cause of action."). This allegation adds nothing to Plaintiff's alleged reasonable belief.

Plaintiff's allegations of "continuing discussions . . . reflecting growing apprehension" and "mounting and collective concerns" regarding Modifier 25 are also unhelpful. (Dkts. 20 ¶ 18; 22 at 12.) For starters,

these allegations are not well-pleaded facts because Plaintiff fails to include any details about what anyone said. He is also asserting his belief about other people's "apprehensions" and "concerns" without providing any factual basis for his interpretation of what they were thinking or feeling. Simply saying "I observed that other people were apprehensive" does not plausibly allege a reasonable belief without some basis for that observation and interpretation. The same is true of his allegation that Defendant's training was "inadequate, that physicians were confused about when and how to use Modifier 25, and that false claims continued to be submitted." These vague, conclusory allegations about what other people thought or did are insufficient to satisfy the *Twombly/Iqbal* standard. *Maglana*, 136 F.4th at 1037 (finding the Court "need not credit mere conclusory statements"); *Afr. People's Educ. & Def. Fund, Inc. v. Pinellas Cnty.*, 184 F.4th 1194, 1202 (11th Cir. 2026) (same).

Evidence Defendant circulated training and instructions on the proper use of Modifier 25 also does not establish Plaintiff's objectively reasonable belief Defendant was submitting false claims. Plaintiff essentially asks the Court to infer wrongdoing from Defendant's efforts to train its physicians on proper billing practices. That inference does

not follow. It's almost the opposite—evidence of a desire to do it right. If training on proper billing practices could establish unlawful billing, a plaintiff could establish an objectively reasonable belief in wrongdoing simply by showing a company tried to do it right. Perhaps that could work if paired with allegations showing a company offered training following some event (like an audit) that discovered fraudulent billing, some allegation the company otherwise knew of on-going misconduct, or (at the very least) a cover email or communication explaining the basis for training. But Plaintiff offers nothing like that. Without any other context, the Court concludes mere evidence Defendant trained its physicians about proper use of Modifier 25 provides no inference of fraudulent billing.

Plaintiff may have had a sincere belief that Defendant was violating the FCA. "[B]ut a sincere belief is not the same thing as a reasonable one." *Hickman*, 985 F.3d at 1289. And Plaintiff has failed to plausibly allege he had an objectively reasonable belief Defendant was committing that violation.

**2. Distinct Possibility**

The distinct possibility standard asks whether "an employee's actions, as alleged in the complaint, are sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a qui tam action by the employee." *Schinnerer v. Wellstar Health, Inc.*, 2022 WL 11964527, at *3 (N.D. Ga. Oct. 20, 2022) (citing *Sanchez*, 596 F.3d at 1304). So to prevail on this claim, Plaintiff must plausibly allege the warnings he gave the Executive Committee in the Summer of 2023 could have led Defendant to fear Plaintiff would report its alleged Medicare fraud to the government. To restate, during that Summer, Plaintiff alleges he "regularly communicated with his physician colleagues and Committee members about his desire to stop all fraudulent Modifier 25 billing," informed Committee members "that additional or improved Modifier 25 training was needed to stop [Defendant]'s unlawful practice of submitting false claims to Medicare," and recommended a coder accompany each doctor "to reduce coding that defrauded the government." (Dkt. 20 ¶¶ 21, 24–25.)

An employee's internal complaints and reports can reasonably give an employer fear of being reported for fraud when the complaints involve (1) internal reports characterizing the employer's conduct as illegal or fraudulent, (2) complaints that lead to an internal audit, (3) complaints to upper management and the employer's ethics hotline, or (4) reports to the Government. *See Sanchez,* 596 F.3d at 1303 (finding a "distinct possibility" of litigation where the employee "complained again and again" about her employer's unlawful actions and warned her supervisors that they were "incurring significant criminal and civil liability"); *Cervalli v. Piedmont Healthcare, Inc.*, 511 F. Supp. 3d 1363, 1369 (N.D. Ga. 2021) (finding allegations of complaints that led to an internal audit supported a reasonable conclusion that the employer could have feared FCA liability); *Schinnerer*, 2022 WL 11964527, at *4 (finding Plaintiff's complaints "to upper management personnel" and the "ethics hotline" would put employer "in reasonable fear of being reported to the federal government or sued in a qui tam action"); *see also Childree v. UAP/GA CHEM, Inc.,* 92 F.3d 1140, 1146 (finding a distinct possibility of litigation where the employee provided extensive information about her employer's fraudulent billing to a Government official and later testified about the

fraudulent billing at a Government hearing). On the other hand, mere internal reports of wrongdoing or mischarging the government, without more, are insufficient to establish a "distinct possibility" of FCA litigation. *See Sanchez,* 596 F.3d at 1304 (acknowledging cases from the Fourth and Sixth Circuits requiring more than the mere reporting of wrongdoing or mischarging); *Prime v. Post, Buckley, Schuh & Jernigan, Inc.*, 2013 WL 4506357, at *12 (M.D. Fla. Aug. 23, 2013) (finding internal reporting failed to raise a "distinct possibility" where plaintiff submitted a memorandum with no allegations that overbilling was unlawful and did not attempt to involve legal representatives). That's because these internal reports don't cross the line from merely identifying misconduct (as any good employee might choose to do) to raising the specter of illegality or the threat of an adversarial proceeding. *See, e.g.*, *Mann v. Olsten Certified Healthcare Corp.*, 49 F.Supp.2d 1307, 1315–16 (M.D. Ala. 1999) (finding Plaintiff's "routine efforts to correct mistakes in billing" did not make employer fear being reported for fraud, whereas Plaintiff's contacts with the legal department and the Medicare-regulations support person did); *U.S. ex rel. Carpenter v. S & K Technologies, Inc.*, 2011 WL 3664415, at *12 (M.D. Ga. Aug. 19, 2011)

("[P]rotected activity must involve situations in which litigation could be filed legitimately, not situations in which an employee . . . just imagines fraud.").

Plaintiff's internal communications don't cross that line. He insisted on additional training and the use of a coder. That is all Defendant could have thought he wanted. His heartfelt desire to stop what he perceived to be improper billing did not raise the specter of litigation. Nor did his demand for a coder. Neither of these recommendations suggested he intended to initiate an action under the FCA or raised any distinct possibility of a government investigation. Likewise, his mere reference to "fraudulent Modifier 25 billing" and the need to stop the "unlawful practice of submitting false claims to Medicare" never gave any suggestion he (or the government) would sue Defendant under the FCA. Insistence that an employer provide training to stop an allegedly illegal practice does not suggest the possibility of adverse litigation. Plaintiff's allegations thus do not support a reasonable conclusion that there was a "distinct possibility" of FCA litigation.

Because Plaintiff has not adequately alleged either an objectively reasonable belief that Defendant violated the FCA or a distinct possibility of FCA litigation, he has not alleged he engaged in statutorily protected activity. This precludes his retaliation claim.

**B. Awareness and Causation**

To state his claim for retaliation, Plaintiff must also allege Defendant was aware of his protected activity and fired him because of it. *Mack v. Augusta-Richmond Cnty., Ga.*, 148 F. App'x 894, 897 (11th Cir. 2005) ("[T]o have acted in a retaliatory manner, it follows that [the employer] must have been aware of and acted as a result of [the plaintiff's] allegedly protected conduct."); *see also United States v. HPC Healthcare, Inc.*, 723 F. App'x 783, 792 (11th Cir. 2018) (noting to establish a causal connection, plaintiff must show that "the employer was at least aware of the protected activity"). Defendant argues that—putting aside Plaintiff's failure to allege protected activity—Plaintiff also failed to allege any well-pleaded facts showing he notified Defendant of his protected activity. (Dkt. 21-1 at 20.) The Court agrees.

In response, Plaintiff states "as discussed above, the Complaint repeatedly and explicitly alleges that [Plaintiff] put [Defendant] on notice

of his efforts to stop the billing fraud." (Dkt. 22 at 17.) But Plaintiff does not say which allegations support this assertion, and he does not explain how he provided notice. It is Plaintiff's burden to identify which allegations support his argument. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Plaintiff does not provide a meaningful response and thus concedes Defendant's argument. *See Smartbiz Telecom LLC*, 688 F. Supp. 3d at 1239 ("A party's failure to meaningfully respond to the opposing party's responsive counterarguments constitutes a concession of the counterargument's persuasiveness."); *Weinstein*, 977 F.Supp.2d at 1286 (same).

And even if the Court reaches the merits, the complaint's notice allegations fall short. Plaintiff merely alleges he "engaged in many communications with [Defendant] as a treating physician and as a Committee member that put [Defendant] on notice that FCA litigation and liability was a reasonable possibility" and that "[Defendant] knew and understood that [Plaintiff] believed [Defendant] violated the FCA by submitting . . . false claims to Medicare." (Dkt. 20 ¶ 32.) Broken down, that is nothing but a conclusory assertion that he "put them on notice

that FCA litigation was a reasonable possibility." *See Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 708 (11th Cir. 2014) ("[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *W. Sur. Co. v. Steuerwald*, 760 F. App'x 810, 813–14 (11th Cir. 2019) ("Under the plausibility standard, threadbare recitals of a cause of action's elements, supported by mere conclusory statements fail to state a claim."). Plaintiff does not allege the facts necessary to move these assertions from conclusions to well-pleaded allegations. Plaintiff never says what he said to create that "reasonable possibility"; he just says he created it.

He also never alleges anyone involved in his termination actually knew about these "many communications." *See HPC Healthcare*, 723 F. App'x at 792 (dismissing retaliation claim because, among other reasons, the complaint was "devoid of any allegations that the decision-makers [] were aware" of plaintiff's protected activity); *United States ex rel. Rehfeldt v. Compassionate Care Hospice Grp., Inc.*, 2021 WL 2229057, at *7 (M.D. Ga. June 2, 2021) (finding Plaintiff failed to allege causation because there were no facts alleging "any person involved in his termination . . . actually knew of his role in the qui tam action"). It is the

individuals who decided to terminate Plaintiff—not colleagues generally or Defendant generically—who needed to be aware of his protected activity.

The only decision-maker the complaint identifies is Dr. Snehal Dalal (Defendant's Chairman), who sent the letter terminating Plaintiff. (Dkt. 20 ¶ 56.) Plaintiff never alleges he spoke with Dr. Dalal about alleged misuse of Modifier 25 or even that Dr. Dalal attended any of the Executive Committee meetings at which Plaintiff raised his concerns. Likewise, he never alleges that anyone who attended those meetings spoke with Dr. Dalal about Plaintiff's concerns. He explains his communications with Dr. Dalal about the harassment allegations leveled against him, conditions Dr. Dalal imposed on him, the steps Defendant took to investigate those allegations, his response to Dr. Dalal, and the outcome of the investigation. (*Id.* ¶¶ 38–70.) But he never alleges he said anything to Dr. Dalal about Modifier 25. He generically alleges Dr. Dalal's actions were "manufactured by [Defendant] . . . in retaliation for his statutorily protected activity" (*Id.* ¶¶ 43, 45, 47), but alleges no facts to support that conclusory allegation. *See Maglana*, 136 F.4th at 1037 ("[W]e need not credit mere conclusory statements."). And again,

Defendant acted through people. So to adequately allege "awareness" as part of causation, he must plausibly allege that the person (or people) who fired him were aware of his Modifier 25 complaints. He does not do this. *See Mack*, 148 F. App'x at 897 (finding that the entity with "ultimate power" to terminate plaintiff "must have been aware of" the protected conduct).

In short, Plaintiff does not allege either that Dr. Dalal was aware of his Modifier 25 allegations when he made the termination decision or that other Executive Committee members manipulated Dr. Dalal into terminating him based on their awareness. He just says "the company knew and the company did it." Determining that Plaintiff sufficiently alleged Defendant knew of his protected activity would therefore require the Court to fill gaps in the amended complaint and supply facts that Plaintiff has not alleged. The Court will not do so. Plaintiff's retaliation claim fails for this reason as well.

**C. Breach of Contract**

Defendant argues that without the federal retaliation claim, the Court should dismiss Plaintiff's state law breach of contract claim

because the "parties are not of diverse citizenship, and the FCA claim is the only claim triggering federal-question jurisdiction." (Dkt. 21-1 at 25.)

A federal court has the discretion to decline supplemental jurisdiction when it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). "In making this decision, the court should take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Cook ex rel. Est. of Tessier v. Sherriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1123 (11th Cir. 2005). If federal claims are dismissed prior to trial, dismissal of state claims is strongly encouraged. *L.A. Draper & Son v. Wheelabrator-Fryer, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

The Court declines supplemental jurisdiction. Plaintiff's remaining claim arises entirely under state law. The case is still young. Discovery has not started and refusing supplemental jurisdiction would not delay the case. The statute of limitations also has not run on Plaintiff's breach of contract claim. *See* O.C.G.A. § 9-3-24 (applying six-year statute of limitations period to actions for breach of written contract). And, finally, a Georgia court is better suited to adjudicate Plaintiff's state-law claim.

## IV. Conclusion

The Court **GRANTS** Defendant's Motion to Dismiss (Dkt. 21) and **DIRECTS** the Clerk to close this case.

**SO ORDERED** this 29th day of September, 2026.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE